## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TOM ROGERS, et al<br>on behalf of himself and the<br>class of all others similarly situated, | : <br> : <br> : <br> : | |
| Plaintiffs, | : <br> : | NO. _____ |
| v. | : <br> : | |
| ACTION LAB ENTERTAINMENT<br>463 East Main Street<br>Uniontown PA 15401 | : <br> : <br> : <br> : | CLASS ACTION |
| and | : <br> : | |
| BRYAN SEATON<br>306 Bridlewood Court<br>Canonsburg, PA 15317<br>Defendants. | : <br> : <br> : <br> : | JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned counsel, bring this action for themselves and other similarly situated, against Defendants. Plaintiffs seek certification of this matter as a class action. For their complaint against Defendants, Plaintiffs allege as follows:

## NATURE OF THE CASE

1.    Action Lab Entertainment ("ALE") is a publishing company that claims to have thousands of creators who have signed contracts to work with them, having told one creator "We are simply not willing to extensively rewrite a contract that has proven itself fair and effective to both Action Lab and thousands of creators."

1

2.      ALE claims to have had revenues of more than $1.25 million in 2016

(https://bleedingcool.com/comics/recent-updates/action-lab-announce-death-zombie-tramp-july-2018-diamond-summit/).

3.      This action is brought by Plaintiffs as a Class Action on their behalf and on behalf of all other persons similarly situation, under the provisions of Rules 1701 et seq., seeking injunctive relief and monetary compensation.

4.      This Class consists of all creators who have signed agreements with ALE.

## THE PARTIES

### Plaintiffs

5.      Tilly Bridges and Susan Bridges are citizens and residents of the state of California.

6.      Chad Perkins is a citizen and resident of the state of Michigan.

7.      Corey Kalman obo Zero Space, is a citizen and resident of the state of Nevada. Mr. Kalman is the president of Zero Space and authorized to make decisions on behalf of the company.

8.      Brockton McKinney is a citizen and resident of the state of North Carolina.

9.      Larkin Ford is a citizen and resident of the state of Georgia.

10.     Erica Carlson-Schultz obo Fenix Works, Inc., is a citizen and resident of the state of New Jersey.

11.     Rylend Grant is a citizen and resident of the state of California.

12.     David Pepose is a citizen and resident of the state of California.

13.     Jorge Santiago, Jr. is a citizen and resident of the state of Georgia.

14.     David Schrader is a citizen and resident of the state of California.

15.    Kristian Horn is a citizen and resident of the state of California.

16.    Joshua Henaman is a citizen and resident of the state of Oregon.

17.    Jeremy Whitley is a citizen and resident of the state of North Carolina.

18.    Jason Strutz is a citizen and resident of the state of Michigan.

19.    Emily Martin is a citizen and resident of the state of California.

20.    John J. Perez is a citizen and resident of the state of California.

21.    Ken Marcus is a citizen and resident of the state of Virginia.

22.    Tom Rogers is a citizen and resident of the state of Oregon.

23.    John Reilly is a citizen and resident of the state of Virginia.

24.    Dexter Weeks is a citizen and resident of the state of New Jersey.

25.    Massimo Rosi is a citizen and resident of Italy.

26.    Jason Inman and Ashley Victoria Robinson are citizens and residents of the state of California.

27.    Ben Matsuya is a citizen and resident of the state of California.

28.    Dillon Gilbertson is a citizen and resident of the state of California.

29.    James Wright is a citizen and resident of the state of California.

30.    Jackie Crofts is a citizen and resident of the state of Indiana.

31.    Riley Biehl is a citizen and resident of the state of Washington.

32.    Martheus Wade is a citizen and resident of the state of Tennessee.

33.    Christopher Mills is a citizen and resident of the state of Maine.

34.    Anthony Ruttgaizer is a citizen and resident of Toronto, Ontario, Canada.

35.    Robert Harrington is a citizen and resident of the state of California.

36.    DeWayne Feenstra is a citizen and resident of the state of California.

37.    Colleen Douglas is a citizen and resident of the United Kingdom.

38.    John Matsuya is a citizen and resident of the state of California.

39.    Rod Espinosa is a citizen and resident of the state of Texas.

40.    Steve Bryant is a citizen and resident of the state of Illinois.

41.    Mark Stegbauer is a citizen and resident of the state of Wisconsin.

**Defendants**

42.    Defendant ALE is a Pennsylvania corporation with its corporate offices at 463 East Main Street, Uniontown PA 15401.  At all material times hereto, Defendant was doing business throughout the continental United States, including the Commonwealth of Pennsylvania.  Defendant acted through its agents, servants, and employees engaged in the business of publishing and/or selling, either directly or indirectly through third parties, comic books, print and digital, created by the Plaintiffs identified herein.

a.  Defendant is, and was at all relevant times, duly authorized to conduct business in the Commonwealth of Pennsylvania, and possesses offices and operations within the Commonwealth.

b.  At all times relevant hereto, Defendant regularly conducted and solicited business within the Commonwealth of Pennsylvania, and specifically the Middle District of Pennsylvania, and continues to do so.

c.  Defendant, either directly or through its agents, servants, and employees, does business in the Commonwealth of Pennsylvania, including in the Middle District of Pennsylvania, and at all relevant times, has sold and distributed its products in the Commonwealth of Pennsylvania, including the Middle District of Pennsylvania.

4

d.  Defendant derives substantial revenue from goods used or consumed in the Commonwealth of Pennsylvania, including the Middle District of Pennsylvania.

e.  Defendant reasonably expected, or should have reasonably expected, that its actions could or would have consequences within the Commonwealth of Pennsylvania, including the Middle District of Pennsylvania.

f.  It is believed and therefore averred that Defendant, both in the past and presently, takes advantage of the infrastructure of the entire Commonwealth of Pennsylvania, including the Middle District of Pennsylvania, including, without limitation, roads, highways and airports.

43.     Defendant Bryan Seaton is a citizen and resident of the Commonwealth of Pennsylvania with offices at 306 Bridlewood Court, Canonsburg, PA 15317 and/or RR 1 Box 327, New Salem, PA 15468 and a residence at 50 Main Street, Grindstone, PA 15442 and/or 603 West Street, New Salem, PA 15468.  At all material times hereto, Defendant was doing business throughout the continental United States, including the Commonwealth of Pennsylvania. Defendant acted through his agents, servants, and employees engaged in the business of publishing and/or selling, either directly or indirectly through third parties, comic books, print and digital, created by the Plaintiffs identified herein.

a.  Defendant is, and was at all relevant times, duly authorized to conduct business in the Commonwealth of Pennsylvania, and possesses offices and operations within the Commonwealth.

b.  At all times relevant hereto, Defendant regularly conducted and solicited business within the Commonwealth of Pennsylvania, and specifically the Middle District of Pennsylvania, and continues to do so.

c.  Defendant, either directly or through his agents, servants, and employees, does business in the Commonwealth of Pennsylvania, including in the Middle District of Pennsylvania, and at all relevant times, has sold and distributed his products in the Commonwealth of Pennsylvania, including the Middle District of Pennsylvania.

d.  Defendant derives substantial revenue from goods used or consumed in the Commonwealth of Pennsylvania, including the Middle District of Pennsylvania.

e.  Defendant reasonably expected, or should have reasonably expected, that his actions could or would have consequences within the Commonwealth of Pennsylvania, including the Middle District of Pennsylvania.

f.  It is believed and therefore averred that Defendant, both in the past and presently, takes advantage of the infrastructure of the entire Commonwealth of Pennsylvania, including the Middle District of Pennsylvania, including, without limitation, roads, highways and airports.

44.    Each Defendant has been the parent, subsidiary, alter ego, agent, apparent agent, joint venturer, or employee of the other defendant, and/or unnamed corporate entities involved in the manufacture, sale, distribution, and marketing of Defendants' publications, and in the conduct alleged herein, each has been acting within the course and scope of said parent-subsidiary relationship, alter ego, agency, employment, or joint venture with the advanced knowledge, acquiescence, or subsequent ratification of each and every remaining Defendant.

**JURISDICTION AND VENUE**

45.    Jurisdiction is based on diversity as there is complete diversity among all named parties.

46.     Supplemental jurisdiction of certain claims is based on 28 U.S.C. §1367(a).

47.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) based on Defendant ALE doing business in the Commonwealth of Pennsylvania, as well as throughout the United States.

48.     The relief sought exceeds $150,000 and the local arbitration limits.  Certain properties owned by individual plaintiffs exceed $100,000.


## CLASS ALLEGATIONS

49.     This action is brought by Plaintiffs on behalf of themselves and others similarly situated to seek injunctive relief, monetary compensation, and/or other available relief.

50.     The class represented by Plaintiffs consists of all persons who have had signed publishing/licensing agreements with ALE. This class of Plaintiffs will hereinafter be referred to as the "Creators".

51.     On information and belief, the proposed Creators Class consists of thousands of members located throughout the world. The members of the Creators Class are so numerous that joinder of individual members herein is impracticable.

52.     Common questions of law and fact predominate in this action that relate to and affect the rights of each member of the Creators Class and the relief sought; for example, and not by way of limitation, each Plaintiff has signed a licensing agreement with ALE and seeks dissolution of said agreement/a ruling that said agreement is legal null and void.

53.     The claims of Plaintiffs are typical of the claims of the Creator Class in that the claims of all members of the Creator Class, including Representative Plaintiffs, depend on a showing of the acts and omissions of Defendants upon which liability is based.

54.     The representative Plaintiffs can and will fairly and adequately protect the interests of the Creator Class.

55.     Undersigned counsel and firms with which it is associated will adequately represent the interests of the class.

56.     Undersigned counsel and firms with which it is associated have adequate financial resources to assure that the interests of the class will not be harmed.

57.     The questions of law and fact common to the members of the class predominate over questions affecting individual class members.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would confront the Defendants with incompatible standards of conduct.

59.     Adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

60.     A class action would permit Plaintiffs to proceed against Defendants in an economical manner, and to prevent the massive duplication of discovery and other similar proceedings which would occur if there were a multiplicity of actions.

61.     In view of the complexities of the issues or the expenses of litigation, in the absence of a class action the separate claims of individual class members would be insufficient in amount to support separate actions.

62.    The Middle District of Pennsylvania is appropriate for the litigation of the claims of the entire class.

## GENERAL ALLEGATIONS

63.    ALE signed multiple creators to contracts with the promise of having creators' properties put into print (as opposed to digital).

64.    ALE provided each creator a handbook (see Exhibits A – C) for sample handbooks.

65.    In the handbooks, ALE promised to have creators' works released in print.

66.    In the handbooks, ALE acknowledged its obligations to promote and market creators' works.

67.    In the handbooks, ALE acknowledged its obligations to report sales and income on a quarterly basis to all creators.

68.    ALE failed to put into print a large number of projects.

69.    ALE failed to properly market and promote creators' projects.

70.    ALE failed to report sales and income to creators on a quarterly basis despite providing sample sales reports to creators.  See Exhibit D.

71.    ALE failed to properly maintain social media accounts.

72.    ALE failed to retain persons to carry out its promises to creators.

73.    ALE failed to do the bare minimum to drum up retailer support.

74.    ALE changed terms of agreements; for example, it would not solicit a creator's project until a certain number of issues were complete.

75.    ALE closed offices and furloughed or laid off staff without informing creators.

76.     ALE did not routinely communicate with creators, often wholesale ignoring communications from creators.

77.     Creators paid out of pocket in reliance of ALE's promises to print creators' projects.

78.     Creators were not informed about delays in publication, which led to them fruitlessly spending money out of their own pockets on marketing and promotion.

79.     ALE failed to provide accurate quarterly reports that include Comixology sales.

80.     ALE failed to account for foreign licenses that were earned by the Defendant.

81.     ALE failed to pay freelancers monies owed to them.

82.     The ALE website has completely ceased to work and is currently showing a mostly blank screen with a link to Comixology that does not promote any of their current, upcoming, or back catalog of books.

83.     ALE has consistently failed to produce Plaintiffs' books in a timely fashion.

84.     Successfully publishing books requires releasing them on their solicited date and ALE has frequently failed to do this, leading to returns and diminished orders from retailers.

85.     Publishing date changes have frequently been blamed on the distributor, Diamond, and never addressed at a company level.

86.     Failing to release a book on time means that it cannot be adequately advertised by creators, who are then unable to schedule signings or events around the release.

87.     Creators are not informed of changes to solicited release dates and plans.

88.     Single issues have been solicited and simply not released because ALE does not feel there have been sufficient pre-orders, a violation of the agreement.

89.     Entire books have been held or cancelled because ALE deemed them to have insufficient pre-order numbers, although this was a result of their non-existent promotion attempts.

90.     ALE failed to provide the most basic and in many respects free promotion and advertising that creators should expect.

91.     ALE forced Creators to pay for tables at comic conventions that ALE used for its own purposes, sold copies of Creator's books (copies paid for by the creators themselves) at these conventions, and failed to account for these sales.  Creators therefore received much less for these sales than they would have received had ALE printed copies itself.  Most convention sales were never recorded. ALE has failed to provide any payment or proof of sale for books sold by the company at conventions. Convention sales never appear on records and there is no way for a creator to see what if any of their books were taken to a convention, which were sold, what was paid for them, or even a record of how that has affected the inventory of the books for which the creators is billed.

92.     This is also true of any records around creators themselves purchasing books from ALE, for which creators are forced to pay wholesale price, but those numbers are never recorded as a cost paid to ALE by a creator.

93.     No creators are provided with primary documentation of any of the payments or costs listed on their ledgers and it has been a matter of record with other creators that numbers on digital platforms and elsewhere are not correctly calculated on the ledger. ALE has been through three different accountants and, at times, been without an accountant for long stretches.

94.     ALE has frequently and without notification or clearance from creators, printed advertising both in issues and within the contents of trade paperbacks without paying any of that

revenue to creators, despite agreements assuring creators a percentage of the gross profit of the book, of which paid advertising would be a part.

95.     ALE prints a minimum of 2000 trade paperbacks. These are trades which have not been pre-ordered, thus the creators are unfairly burdened with these costs. This publication mechanism was never communicated to creators ahead of signing agreements.

96.     The minimum trade paperbacks and the digital publishing insure that a creator's books are bound to ALE in perpetuity.

97.     In November or December of 2019, Defendant Seaton apparently stepped away from his duties at ALE without telling any Creators, and left Shawn Pryor in charge of daily operations.

98.     The ALE offices were shut down without reason from 12/16/19 to 1/6/20, during which time Creators were not being paid and marketing was nor being conducted.  Mr. Pryor was unable to pay any Creators during this period of time.

99.     Defendant Seaton later told Creators that the offices were closed for the holidays and all due payments should have been issued prior to 12/16/19.

100.    Defendant Seaton told Creators that Mr. Pryor has been incapable of handling the company and left in January of 2020.

101.    In February of 2020, Defendant Seaton claimed to have allegedly resigned and no one was left in charge of the company because the supposed board of directors did not replace the president.

102.    ALE shut down again in March of 2020 but did not tell any of its Creators. During this time no work was performed by ALE and no Creators were paid.

103.    ALE told its creators that it reopened during the last week of June 2020.

104.    ALE told its creators that Diamond had closed in March, immediately stopped releasing all planned new releases, stopped sending sales reports, and stopped paying all publishers monies owed for books sold in February and March.  ALE further said that Diamond reponed in June of 2020, started shipping new releases already in the Diamond warehouse, and started paying publishers monies owed under a 13-week repayment plan.

105.    By email dated June 30, 2020, ALE declared that Bryan Seaton was still CEO/Publisher of ALE but had decided to step down, and "the board" had not replaced him or the company's then-president.

106.    Bryan Seaton is still running ALE.

I.    **JEREMY WHITLEY/EMILY MARTIN/JASON STRUTZ – *PRINCELESS* AND *RAVEN THE PIRATE PRINCESS***

107.    These Creators entered into an agreement on 5/23/2017 to license the rights to publish a book named Pirate Princess.  See Exhibit E.

108.    These Creators entered into an agreement on 12/17/2014 to license the rights to publish a book named *Princeless*.  See Exhibit F.

109.    *Princeless* had sequels and spin-off, *Raven the Pirate Princess* and *The Order of Dagonet*, also published by ALE.

110.    ALE failed to provide Creators with quarterly earnings reports and to pay us the balance of said earnings reports on a reasonable schedule despite the book regularly being published for a number of years.

111.    Frequently Creators were not provided with updated numbers nor paid for the sales of their books.

112.    ALE failed to pay artists brought on to help with both *Princeless* and *Raven the Pirate Princess* in a timely fashion.

113.    Artists have been left unpaid for finished work for months and frequently years. This has harmed Creators' credibility as creators with the artistic community and led several artists to quit and refuse to work on Plaintiffs' books again.

114.    When confronted about non-payment in the past, ALE has seen fit to unpublish digitally published comics rather than make payments to creators; for example, books are published digitally on a platform called Comixology.

115.    When confronted about digitally publishing issues of *Raven the Pirate Princess* without paying artists, ALE chose to remove them from Comixology rather than make good on the payments they owed.

116.    Seaton told Creators that in the year 2020 he shut the entire company down twice, but Creators were never told this or given an explanation as to why this would have been done.

117.    Seaton has frequently failed to answer time sensitive questions in a timely manner, despite nothing being able to be done at the company without his say so.

118.    Seaton told Creators that his email had been locked for some time and he did not know how to access it and had not pursued getting it unlocked.

119.    When Creators asked for their contract to be voided based on non-payment and other issues, Seaton called Creators and threatened to bankrupt them with legal fees.

II.    **TOM ROGERS/JOHN REILLY/DEXTER WEEKS -** *HERALD: LOVECRAFT &*
*TESLA*

120.    These Creators entered multiple agreements, including an agreement on 8/9/2018.
See Exhibit G.

121.    *Herald: Lovecraft & Tesla* was a comic series published by ALE from 2014 to
2019.

122.    ALE failed to update quarterly sales reports in a timely manner, and even when
they did, these reports were vague and lacking essential data.

123.    The formatting and content of these reports also varied wildly.

124.    Plaintiffs never received sales data from Diamond and Comixology.

125.    There were no sales or return numbers listed at all from Quarter 4 of 2014 through
Quarter 1 of 2015.

126.    This obviously violates their agreement.

127.    ALE consistently failed to pay Creators on time throughout the course of their
series' publication. For the first three volumes, Creators were paid on a royalties-only basis
based on quarterly reports.  These quarterly reports were also notoriously late.

128.    A new payment schedule was agreed upon by way of a work-for-hire licensing
agreement in 2018 which stated, "Payment(s) due hereunder shall be made by Action Lab within
30 days of the acceptance by Action Lab and the Licensor(s) of completed work and the
submission of an invoice from Creator billing Action Lab for the work."

129.    All of the line art for the final volume was completed by August of 2018, but
Creators were then told that invoices would not be approved until the month of each issue's
physical release.

130.    ALE changed the terms of the agreements and failed to compensate the Creators within the agreed-upon payment schedule.

### III.    JOHN J. PEREZ – *ARCHON: BATTLE OF THE DRAGON*

131.    This Creator signed an agreement on 3/4/2015.  See Exhibit H.

132.    ALE failed to pay Creator page rates, which meant he had to incur debt to pay for the books and work on spec.

133.    The total unpaid cost for *Archon* is in excess of $25,000.

134.    Creator sought to attempt crowdfunding for financial assistance, but ALE threatened to take ownership of any crowdfunding even though ALE was not paying any funds for the creation of the books.

135.    ALE did little to no marketing for the book.

136.    Creator obtained an email list for North American and United Kingdom shops in order to directly solicit their book.

137.    Creator's book was slated to run from August to December for the first five issues. The dates given by Diamond for releases began shifting around. ALE blamed all delays on Diamond.  Issues 3 and 4 were shifted and Plaintiffs were unable to personally promote their projects on social media.

138.    ALE released the books in a collected trade paperback.  ALE cuts cost by printing the individual issues and trades at the same time. The result was a poorly manufactured trade paperback, below industry standards.

139.    Creator was not sent financial statements for years.

140.    There is no record of costs for any of the promotion or advertising that ALE supposedly did for the books. Creator was given a sum total that was tossed onto the project's costs without any evidence any of that expense was actually spent on the books.

141.    Although ALE had a presence at comic conventions, Creator's book was not even collected as a trade until 2016, so there was nothing to sell or promote to justify the costs.

142.    ALE was supposed to pay royalties on a quarterly basis but failed to do so. Creator was never provided any sales figures for their book, which was published between August 2015 to January 2016.  Seaton claims he discarded those records: "We did keep records of the number of copies but are not required by law to keep financial ledgers for more than 3-5 years, and even Diamond has cleared such records from its system."  Email dated 9/4/2021. Upon information and belief, this is untrue.

143.    ALE claims Creator's books lost $6,862.28. The spreadsheet that is currently available is missing several years of revenue reporting.  The books had an uptick in digital sales when Comixology launched their Unlimited service but no sales were reported to Creator.

## IV.    JOSHUA HENAMAN – *BIGFOOT: SWORD OF THE EARTHMAN*

144.    This Creator signed an agreement on 1/22/15.  See Exhibit I.

145.    Creator had initially self-published this project with an initial print run of 3,000 individual issues for issue #1.

146.    ALE wanted to re-release issues 1 – 6 individually and compile them in a trade paperback.

147.    ALE was asked about what constitutes costs under Section 6 (Revenue Handling), sub section B & C of the agreement. According to Seaton, "Other costs are very small cost one

example would be postage if we send out books to Diamond etc. not really a marketing or production cost doesn't happen often and not much money so it goes under other.  We list them as other because of the small amounts but they can be broken out should you have a question. Further in regards to the second part, I understand the vagueness of the language is a bit concerning, but its really a catch all for actual miscellaneous expenses, and those count against any profits to creators or publisher, so there's no incentive for us to pad that."  Sic.

148.    Creator only received one royalty report, on 9/2/16, that covered April to June of 2016. In that report, Advertising and Promotion was listed as a cost of $520 but no advertising or promotion was ever conducted.

149.    Creator has received no accounting of books sold at conventions by ALE.

150.    The company switched to a google spreadsheet in July 2017 to capture revenue, but, there was no accounting of marketing, advertising, convention sales, etc. on the spreadsheet.

151.    The book was first released digitally in December of 2015.  The 9/2/16 sales report did not cover December 2015 to March 2016, when sales numbers would have been their highest.

152.    Digital sales also stopped being reported January 2020.


**V.    RYLEND GRANT – *ABERRANT***

153.    This Creator signed an agreement on 7/21/17.  See <u>Exhibit J</u>.

154.    Due to mismanagement, there was a five month printing delay between issues 4 and 5 of *Aberrant* Volume 1.

155.    Release of the Volume 1 trade paperback was delayed over six months. As a result, big outlets like amazon.com kept canceling people's preorders on those books, removing

the book from the site completely. There would be two to three week stretches where no one could even find a place to pre-order the book.

156.    Despite these delays and Defendants' usual practice of grossly overprinting, *Aberrant* was in solid financial shape after the first volume (the first 5 issues) wrapped up.  But it plunged into deep and hopeless debt during the rollout of the second volume, due almost exclusively to poor management of the property and gross neglect on the part of Defendants.

157.    The releases of Season 2 issues were delayed over and over again for months at a time. Orders were canceled due to the delays. It was impossible for the creator to promote the release of the Volume 1 trade paperback or any of the Volume 2 releases without knowing when the books would be released.  Creator had to cancel multiple signings and events. Many thought the series had just been canceled altogether.

158.    In an email dated April 7, 2019, ALE admitted to the delays laid out above and agreed that these delays harmed sales and preorders on the 2nd volume:

> Where they may be a factor, to your point, is with volume 2 (had we known about the issues with the schedule, perhaps we could have held volume 2 out a bit - but obviously that wasn't the case).

159.    Despite knowing that preorders were low, Defendant Seaton ordered an absurd number of Series 1 trades and Series 2 individual books, burying this project in hopeless debt.

160.    Seaton has told the creator that he must pay for all of those extra issues (at a cost of more than $15,000) in order to get the property back.

161.    As of this date, ALE has failed to provide meaningful accounting for *Aberrant* in over a year. Sales figured were originally prepared quarterly, then stopped updating for a time. When they were updated again they failed to follow the format ALE originally required.

162.    ALE never informed creators of what the company was spending money on and what the creators were being charged for. Creators asked for explanation/clarification multiple times and received no responses.

163.    Digital sales figures numbers were often not accounted for and certain fees were charged twice here or there. Some creators placed huge orders themselves at comic shops but never saw those sales accounted for on the sales sheets.

164.    ALE did little to nothing to promote *Aberrant* despite promises to do so. Creator was forced to do all of his own marketing and obtained several reviews and interviews from sources who informed him that they had never received any information from ALE about the books.

165.    *Aberrant* was ultimately reviewed and covered very well, won a prestigious industry award, and was nominated for two others thanks to the Creator's efforts. ALE rarely publicized any of the good reviews and did not even post to social media. Another of Creator's works was nominated for four industry awards but ALE never even acknowledged this, nothing on social media or even on their website.

## VI. DAVID SCHRADER/KRISTIAN HORN – *BABY BADASS, BABY BADASS RETURNS*

166.    These creators signed an agreement in 2015. See <u>Exhibit K</u>.

167.    In an email dated 8/28/15, the Creator was told that the project was creator owned so there would be no funding for production; ALE would simply finance distribution.

168.    The first property, *Baby Badass*, was released in 2018.  On November 30, 2018 ALE sent Creator a single residual payment for the amount of $257.38.  Creator received nothing else for the next 2 ½ years.  Creator was not sent sales figures despite asking multiple times and

being informed that the *Baby Badass* trade paperback is one of ALE's better selling titles at conventions.

169.    ALE's reputation adversely impacted Creator's efforts to sell an animated series based on the property.  In 2020, during a meeting with actor/producer Seth Green and representatives from his company, Stoopid Buddy Stoodios, Creator was informed that they did not want to work with ALE because of ALE's poor their reputation.

170.    On September 5, 2021, Creator asked for the rights to the property to be returned and Defendant Seaton offered to pay outstanding royalties of $715.20, demonstrating that ALE and Seaton had been withholding funds from creators.

## VII.    JASON INMAN/ASHLEY VICTORIA ROBINSON/BEN MATSUYA – *JUPITER JET* AND SEQUELS

171.    These creators signed an agreement on 9/15/2016.  See Exhibit L.

172.    ALE and Seaton gave these creators multiple release dates, publicly announced, which were then moved or changed without Creators' consent or knowledge. This affected Creators' ability to market the property, including expensive steps such as hiring a publicist.

173.    Each and every initial publishing date for all five issues of *Jupiter Jet, Jupiter Jet* vol 1 trade paperback, and *Jupiter Jet and the Forgotten Radio* were moved anywhere from 1 week to several months without any notice from ALE.

174.    Per the contract ALE was to furnish with quarterly profit reports. Not a single one was sent to these Creators.  Creators were only given a link to a Google spreadsheet which was never updated. It frequently included advertising and publicity expenses that Creators did not authorize or know about.  No proof of these expenses was ever provided to Creators.

175.    The only time ALE ever updated the aforementioned Google spreadsheet when threatened with legal action in 2021.  Upon information and belief, the spreadsheet was incomplete and Creators are entitled to more than what was reported.

176.    Creators received no accounting of books sold at conventions by ALE even though Creators were present at Action Labs booth at SDCC and NYCC where their book was completely sold out.

177.    Creators were promised help selling the properties yet received no support whatsoever from ALE.

178.    Creators eventually funded the entire series themselves without any assistance from ALE, incurring substantial expenses.

## VIII.   DILLON GILBERTSON – *SWEET HEART*

179.    This Creator signed an agreement on 12/4/2018.  See Exhibit M.

180.    Creator had requested a number of modifications, but by email dated January 3, 2019, Defendant Seaton informed him "We are simply not willing to extensively rewrite a contract that has proven itself fair and effective to both Action Lab and thousands of creators."

181.    Under duress, Creator signed the agreement as is, although he subsequently found out that other creators had been permitted to make some of the modifications he had requested.

182.    During their working relationship, Creator would send multiple communications to ALE but would receive no response.

183.    ALE decided not to publish the project in print, and release solely on a digital platform.  The books were to be released one week apart from each other (as opposed to monthly), which severely hindered any promotional efforts Creator had planned. Furthermore,

when physical books were finally available for sale, Creator was not told, further hurting the book's physical sales by preventing Creator from marketing and promoting his work.

184.    ALE failed to update sales reports after August 2020.  Those reports that were provided contained numerous inconsistencies and incorrect calculations.  Creator reviewed these reports and determined that he was owed several thousand dollars. Creator was never sent the sums to which he was owed, despite correspondence from legal counsel.  Creator was instead told that ALE had incurred printing and marketing expenses that were not included in the sales reports.  Updated reports showed numbers, columns, and categories that did not exist in the previous reports and the newer calculations showed the book was actually selling at a loss, even though according to sales figures the book was selling well.  The figures from ALE were either incorrect, padded by ALE, or the result of gross mismanagement.

185.    Creator has never once been provided any data regarding digital sales for his property.

IX.    **KEN MARCUS/JUSTIN CARMIEN – *SUPER HUMAN RESOURCES***

186.    These Creators signed an agreement on 3/10/14.  See <u>Exhibit N</u>.

187.    ALE published two volumes of *Super Human Resources* over the course of 2016. Volume 1 as a trade reprint, and Volume 2 as four single issues and one trade paperback.

188.    Creators only received a single sales report, in December of 2016.

189.    Creators believe that the figures reported by ALE were not accurate based on contacts with retailers and access to Diamond order figures.

190.    ALE did not expend funds to market the book, and did the bare minimum to promote it even though Diamond awarded the book a distinction referring to it as "Certified Cool."

## X.    COREY KALMAN/BROCKTON McKINNEY/ ZERO SPACE – *AMERIKARATE* AND McKINNEY/LARKIN FORD – *EHMM THEORY*

191.    Kalman and McKinney, trading as Zero Space, signed an agreement for *AmeriKarate* on 11/24/16.  See Exhibit O.

192.    McKinney and Ford signed a separate agreement for *Ehmm Theory* on 11/4/12. See Exhibit P.

193.    ALE published eight single issues of *AmeriKarate* in 2017 and two trade paperbacks.  ALE published eight single issues of *Ehmm Theory*.

194.    Creators ordered about 7,000 copies of *AmeriKarate* books from two stores but the Quarterly Reports from ALE did not reflect these purchases.

195.    ALE undercut sales of the printed books by selling digital copies of the trade collections for $0.03 and $0.04.

196.    Creators have only ever received one payment from ALE, 12/17/18 for $796.02.

197.    ALE conducted minimal marketing and promotion for these books. Creators were willing to pay out of their own pockets for promotional stickers and posters for retailers, and ALE promised to contact retailers about this but failed to do so.

198.    *AmeriKarate* was excluded from a company-wide Amazon Comixology sale.

199.    Because of ALE's failure to market and promote the books, Creators personally lost revenues.

200.     Creators never received the introductory handbook that was supposed to be sent to creators as soon as contracts are signed until six months after the first issue was released.

201.     Creators never received any complimentary copies of their books despite being promised same in the agreement.

## XI.     TILLY BRIDGES/SUSAN BRIDGES – *KILLSWITCH*

202.     These Creators signed an agreement 11/16/2018.  See Exhibit Q.

203.     Creators had ALE add a clause to the agreement specifically stating ALE would provide quarterly reports, but ALE did not sales spreadsheets for the property for more than nine months, from 12/13/2020 to 9/29/2021.

204.     No convention sales were listed on Creators' sales spreadsheet, but Creators were present at a convention where ALE had a table and saw books being sold.

205.     No digital sales are accounted for, even though Creators are aware of readers who purchased digital copies.

206.     Creators' book was never added to the ALE website.

207.     Issue 1 was delayed by two weeks without any notice or reason, through no fault of Creators'.  This meant that all promotion Creators did, paid for by themselves, was all for naught as potential buyers could not find the book and had no way to know if/when it would ever be available.

208.     Issue 2 was again delayed without notice or information as to when it would be available.

209.    After issue 2 was finally released, ALE tried to cancel the book for low sales despite their inability to release it on time or do any kind of promotion for the title that would have increased those numbers.

210.    ALE eventually agreed to print the final two issues, but delayed so long that any purchasers of the first two issues would have given up on the book ever being completed.

211.    ALE forced Creators to pay out of pocket for additions and changes to the books, and to create advertisements that would run in other ALE books.

212.    Creators were required to produce forty pages of additional material for the project, at personal cost to themselves, only to have ALE decide not to use the additional material.

213.    Creators were charged a fee to have their books sold at comic conventions by ALE, a charge that was counted against the book for the privilege of having ALE actually sell the book at their booth during cons. This was not in the agreement and was a bad faith addition to the contractual relationship.

214.    ALE did no promotion for the book, so Creators had to hire a promotional agent and pay for it themselves.

215.    A reviewer at a prestigious magazine was willing to review the book and requested a print copy of the trade. ALE promised to have a print copy created for the reviewer but failed to do so.

216.    Creators asked ALE multiple times to be let out of the agreement.  They have never received a reply.

## XII.    ERICA L. SCHULTZ/FENIX WORKS, INC. – *TWELVE DEVILS DANCING*

217.    This Creator, trading as Fenix Works, Inc., entered into an agreement on 10/23/2017.  See Exhibit R.

218.    Creator's original project was 20 pages long.  ALE required her to provide an additional 12 pages of material.

219.    Creator spent time and money hiring others to create material for her book.

220.    Creator was then told she had to produce another 16 pages of material in order to be published.

221.    Creator was told the price point for her book was increased from $2.99 or $3.99 to $5.99, which would adversely affect sales.

222.    ALE never promoted Creator's book.

223.    ALE never submitted Creator's book for industry awards even though Creator paid for copies to be sent for various awards and ALE promised to handle the efforts.

224.    Creator learned that her book was appearing on pirating websites and informed ALE.  ALE refused to take any steps to require these piracy sites to cease and desist, and told Creator it was her responsibility to write and send DMCA takedown notices.

225.    Creator went months at a time without receiving information regarding sales and payments.

226.    The trade paperback of Creator's book was supposed to be released in November of 2018 but the release date was changed without warning or any explanation.

227.    Creator contacted ALE, and Defendant Seaton told her that the problem was that ALE was changing printers (from Transcontinental to Ave 4) and that Transcontinental refused to release the printed copies even though they had been paid for.

228.    Creator had to cancel book signings because there was no book to promote. When the book was finally set to be released, Creator was not informed so she could not promote it or schedule more signings.  This hurt sales of the book.

229.    At a convention in San Diego in 2018, a potential purchaser attempted to buy the book from ALE's table but the person manning the table (Seaton's daughter) refused to sell the person the book and was particularly rude to the potential purchaser.  Creator was later told that Seaton's daughter was unhappy at having to man the booth.  Her behavior may have turned away multiple purchasers.

230.    Creator has never been told how many units of her book were sold at conventions, or how many copies overall were printed.

231.    Delays were falsely blamed on Diamond.  Creator was specifically told that Diamond assigned ALE a new representative with no experience, someone who later was fired. This person allegedly did not send final order cutoff notices out, and did not send purchase orders to printers so the printer stopped printing books.

XIII.    **JAMES WRIGHT/JACKIE CROFTS – *NUTMEG***

232.    These Creators signed an agreement on 2/9/14.  See Exhibit S.

233.    Creators' series was published between 2015 and 2020.  During this time, ALE conducted little if any marketing or promotion for the book.

234.    Creators were forced to handle the bulk of promotion by themselves.

235.    ALE was contractually obligated to provide quarterly sales reports, but stopped doing so in 2019.  No explanation was given for this.

236.    In December 2018, Creators received an option offer from Universal Content Productions to adapt *Nutmeg* into a television series.  ALE's involvement slowed this process down to the detriment of the project, ostensibly costing the Creators time and money.

237.    ALE overprinted the book, often hundreds of copies more than the market would have called for, making it impossible for the book to turn a profit for the Creators.  Had ALE printed a proper amount of copies and conducted marketing and promotion, sales would have been much better and royalties much higher.

## XIV.   RILEY BIEHL – *MIRANDA IN THE MAELSTROM*

238.    This Creator signed an agreement on 7/11/19.  See Exhibit T.

239.    At that time, the artwork for six issues was approximately half complete.  All six issues were completed at the end of March 2020.

240.    On 4/8/20, Creator learned that the first three issues were available for sale on the Comixology platform. Creator was not made aware of this, and had been given the impression that the books would be rolled out in print and digital on the same date. ALE blamed Comixology for the premature release.  Issues 4 through 6 were also released digitally, and again Creator received no forewarning.  No marketing was ever done by ALE.

241.    ALE never kept Creator informed as to the status of printing the book until 9/14/20, when Creator was asked to approve the proofs for printing the first issue.  Creator subsequently received proofs for other issues for approval.  Release dates were routinely delayed, and delays were blamed on Diamond.  Defendant Seaton referred to Diamond as "a bunch of clowns."

242.    Creator received incomplete sales information and no responses to his requests for same.

243.    No marketing was ever done for the book.

244.    On 4/21/21, Creator was asked to modify the files for the book's trade paperback weeks before its scheduled release.  This required Creator to incur expenses for collaborators to resize certain pages and covers.  The reason was because ALE changed its print specifications, not because Creator did anything incorrectly.

245.    Creator had no communications with ALE about the book's sales until 7/21/21, when Creator was informed the book sold over 1,200 copies. No breakdown of individual issues or trade was given.  No digital sales were included.

246.    After Creator asked for an updated sales report including digital sales, the resulting report included incorrect information and including information from another, unrelated book.

247.    Creator never received any monies for sales.  Defendant Seaton informed him that sales were used to offset costs.  Defendant Seaton informed Creator that all issues had been printed at the same time to save on printing costs.  This was patently false because Creator had to submit multiple files for printing over an extended period of time.


XV.    **MARTHEUS WADE – *SHINOBI: NINJA PRINCESS***

248.    These Creators entered into an agreement on 11/27/12.  See Exhibit U.

249.    ALE failed to advertise and promote the book.  ALE overprinted the book, creating copies that could not possibly be sold.  Late shipping dates made the book impossible for the Creator to promote effectively even though Creator paid for promotion and advertising

30

out of pocket, including but not limited to press releases, social media posts, advertising, retailer incentives, comic store appearances, and convention appearances.

250.    The first volume of *Shinobi: Ninja Princess* was available through Scholastic Books and sold very well.  ALE took its cut and paid a portion to Creator.  When Creator asked about the status of Scholastic Books making the second volume available, ALE said that the liaison with Scholastic Books had changed.  ALE either did not follow up with Scholastic Books, or damaged its relationship with Scholastic Books, thereby resulting in the loss of sales and income to the Creator.

251.    Creator launched a funding campaign in an attempt to salvage the book as well as try to get the books into schools and libraries.  While Creator was involved in these promotional efforts, ALE failed to get involved in the logistics of fulfillment sales despite weeks of prodding from Creator.  ALE eventually informed Creator that a printer had not been secured for the project.  This occurred a few months after the project was funded, which meant that the book was funded without knowing actual production costs.

252.    The books were printed but ALE ordered an excessive number of copies, harming royalties.  ALE failed to conduct any promotion or advertising for the book.  Creator was forced to purchase physical copies directly from ALE to sell at conventions and through his personal online store.

253.    Without Creator's knowledge or consent, ALE entered into an agreement with Comixology to allow readers to read the books for an insignificant fee online.  Creator was never told what the download numbers were and was never told how much they were supposed to be paid for each download.

## XVI.    MASSIMO ROSI – *COLD BLOOD SAMURAI*

254.    This Creator entered into an agreement on 2/21/18.  See <u>Exhibit V</u>.

255.    The book was first published by ALE in 2019. For the first year ALE provided sales reports, but none thereafter.

256.    Creator put Defendant Seaton in contact with an agent for Editions Delcourt in order to sell the license for publishing in France.  Editions Delcourt complained of Seaton's unprofessionalism and it took months to conclude the agreement after the parties had already approved the basic terms.

257.    Creator informed ALE multiple times that he did not receive any sales reports after the first year.  All monies received under the agreement were obtained through Creator's efforts, not those of ALE.

## XVII.    CHAD PERKINS – *BLU LULLABY*

258.    This Creator entered into an agreement on 12/12/18.  See <u>Exhibit W</u>.

259.    Creator was told his book would be a "Digital First", meaning if sufficient digital sales were made a print run would be produced.  However, ALE never informed Creator of a target goal for sales.  ALE failed to properly keep Creator apprised of sales figures despite the agreement requiring quarterly sales reports and timely payments.

260.    The only marketing for the book was a single Tweet and an email.

261.    Creator received minimal communication from ALE, which made it impossible for him to promote the book.

262.    More people wanted to purchase the book in print as opposed to digital.  Yet Creator's book received no assistance from ALE.  The book received no media coverage and was

overshadowed by more extravagantly printed comics from ALE.  ALE permitted digital books to

fall through the cracks, costing sales and forcing Creator to incur expenses that should have been

compensated by digital and/ or print sales.

## XVIII.   DAVID PEPOSE – *SPENCER & LOCKE, GOING TO THE CHAPEL*

263.    This Creator signed an agreement for *Spencer & Locke* on 12/22/2015 and an

agreement for *Going to the Chapel* on 4/5/2018.  See Exhibits X and Y.

264.    Creator has seen negligent and/or fraudulent accounting and bookkeeping

operations from ALE.  Creator has had to regularly inform ALE of incorrect sales figures,

sometimes leading into the thousands of units, as well as erroneously conflating print and digital

sales figures in ways that wrongfully siphoned additional money to ALE.

265.    Creator has received only two royalty checks in five years, the second of which

came only after he threatened legal action in 2020.  To this day, Creator still has not received any

accounting for any digital sales since January 2020.

266.    ALE has charged Creator additional fees not stipulated in the contract, including

Diamond fees and shipping fees for thousands of units that Creator had purchased at a

supposedly discounted rate from ALE. ALE then failed to include these figures in their sales

reports, and accused Creator of exaggerating the numbers despite being providing receipts.

Creator learned after the fact of an undisclosed additional printing of *Spencer & Locke* Vol. 1, as

well as an undisclosed number of books given away by ALE.  Creator has no idea how many

copies of his books have been printed, nor how many printings ALE initiated, even though all of

these copies are counted against royalty payments.  Creator was told that he did not have a right

to this information.

267.    ALE failed to conduct publicity, marketing, or multimedia efforts so Creator had to do all marketing alone.  Creator personally had to call hundreds of comic book shops that had no idea that Creator's books were even available.

268.    Several of Creator's books were delayed, including the final issue of *Going to the Chapel*, which was delayed by over two months.  This hindered sales as well as Creator's attempts at marketing.

269.    Creator is owed monies from ALE for a multimedia option.  Excessive legal costs were incurred by ALE without Creator's knowledge or consent.  This cost Creator financially during the negotiation phase for the option.  Meanwhile ALE injured the option relationship with high-profile production company Legendary Entertainment by refusing to sign any contract that did not give Defendant Seaton executive producer credit and commensurate fees, as well as demanding a percentage of any fees Creator would receive for on-set work as a consulting producer.

270.    ALE failed to pay Creator's representatives any portion of the royalties, forcing Creator to pay out of his own pocket.  Upon information and belief, Creator is due thousands of dollars in royalties.

## XIX.    CHRISTOPHER MILLS – *GRAVEDIGGER*

271.    This Creator entered into an agreement on 1/5/15.  See Exhibit Z.

272.    ALE published Creator's book in 2016.  ALE claimed that the book failed to make a profit but it was and has been made available on Comixology and claimed that the book was still being sold digitally.  Creator received sales reports in late 2016 and early 2017, then no further.

273.    ALE failed to perform marketing or advertising except for a single press release.

274.    Beginning in 2019, Creator made multiple attempts to reclaim his publishing rights.  He was informed that the book was still selling digitally on Comixology, even though he had received no sales reports for years, including any digital sales.  Creator was offered the option of having his rights returned if he purchased all unsold copies sitting at Diamond at wholesale cost plus Diamond storage and shipping fees.  This was an exorbitant request, and shows that ALE improperly overprinted the book and failed to properly maintain its inventory at Diamond.

275.    Creator retained legal counsel to contact ALE, but ALE never responded to that attorney's communications.


## XX.    ANTHONY RUTTGAIZER – *THE F1RST HERO*

276.    This Creator entered into an agreement on 4/1/13.  See Exhibit AA.

277.    This Creator published the first two volumes of his project through ALE.  ALE did next to nothing in terms of marketing for either volume, in violation of their Handbook.

278.    Creator participated in a crossover of properties called Actionverse.  Defendant Seaton handled all the financials and pushed the involved creators to spend additional sums of money, for example, on variant covers.

279.    Defendant Seaton asked involved creators for additional projects and this Creator volunteered Volume 3 of the F1rst Hero.  Creator asked Seaton what he and ALE could do together to improve sales for Volume 3 and was told, "I don't know.  What can YOU do?"  Without assistance from ALE, sales for Volume 3 were poor and Diamond cancelled distribution of the print version after issue 1.  Nobody at ALE informed Creator of this when it happened;

meanwhile Creator was still spending money to complete Volume 3 while ALE made Volume 2 a digital only release via Comixology—again, without informing Creator.

280.    Creator asked for his property rights to be released because ALE had failed to advertise the projects for years, had failed to sell copies of the book at comic conventions (at which Creator appeared), and had grossly overprinted the book which robbed Creator of any chance of profitability.  Seaton refused to return the full property rights.

281.    In 2018 Seaton told Creator that he was negotiating a possible media deal with a Chinese company for Actionverse.  A year later, Seaton repeated this false, unsubstantiated claim of a possible deal being in the works.

282.    Most recently, Seaton offered to sell Creator his rights in exchange for Creator purchasing all remaining trade paperback stock in the Diamond warehouse.

283.    Without Creator's knowledge or permission, The F1rst Hero was shifted to Comixology Unlimited, where it has received tens of thousands of views.  Prior to being offered on Comixology Unlimited, the books had been earning sales for the project and would have continued to reduce any supposed debt the title had incurred had it not been offered basically for free on Comixology Unlimited.  ALE injured Creator financially by doing this.

284.    Creator only received quarterly sales reports from Q2 2016 until Q1 2020. ALE was hiding revenues from Creator.

285.    According to ALE financials from March of 2020, Creator's projects were $3,100.00 in debt.  This year, Seaton demanded $17,000.00 from Creator to free his property rights.  Seaton is charging Creator the wholesale price for books he failed to properly promote and sell, essentially earning the company the level of profit they would have received had they sold the books when they were originally published.

## XXI.  ROBERT HARRINGTON – *SLEIGHER*

286.    This Creator entered into an agreement on 4/23/15.  See Exhibit BB.

287.    ALE failed to provide these Creators with financial breakdowns for their book's release through Diamond.  Creator was told by ALE staff that ALE was working on a new accounting system that would provide sales reports for each creator that would be in place by the end of 2017 or beginning of 2018. These reports were never provided.

288.    The book has been available digitally on Comixology for five years, but Creator has never received a single financial statement or any money from sales of the book.

289.    ALE failed to properly promote the book.  The first issue of this Christmas-themed property was released in November 2016 to capitalize on the Christmas season.  Each issue was released monthly and on time without delay.  Yet ALE ignored the Creator's books.

290.    ALE had no in-house promotions personnel, in violation of their Handbook, and failed to provide Creator with any guidance.

291.    Creator was forced to print multiple physical copies at his own expense in order to send to reviewers because ALE failed to do so.

292.    Creator saw his own book sold at conventions but was never provided sales reports or royalties for those copies.


## XXII.  DEWAYNE FEENSTRA/AXUR ANEAS – *THE ADVENTURES OF AERO-GIRL*

293.    These Creators entered into an agreement on 10/15/19.  See Exhibit CC.

294.    ALE failed to properly conduct marketing or even social media for Creators' books.

295.    ALE has failed to provide sales reports since 2016.

296.     ALE never produced Creators' books for sale at conventions, requiring Creators to pay for their own books to be sold at conventions.

297.     ALE offered to release the property rights if Creators purchased existing stock totaling approximately $13,000, although there is no evidence that such stock exists.

## XXIII.  COLLEEN DOUGLAS – *CARMINE*

298.     This Creator entered an agreement with ALE on 11/15/19.  See Exhibit DD.

299.     This Creator spent thousands of hours and thousands of dollars creating the *Carmine* series, including commissioning variant covers from five renowned comic book artists.

300.     ALE promised that it would offer the *Carmine* series "for sale in both printed and digital form, and would "undertake reasonable effort to market, advertise, and publicize" the *Carmine* series.

301.     The completed *Carmine* series was delivered to ALE on February 28, 2020, but at the time Defendant Seaton had allegedly resigned and no one was left in charge of the company.

302.     Defendant Seaton claimed to have shut down ALE in March of 2020 and as a result could make no efforts to support the release of *Carmine*.

303.     *Carmine* was released during the time Seaton allegedly shut down ALE.

304.     ALE released all five issues of the *Carmine* series digitally at the same time on April 22, 2020. That same day, ALE released over 100 titles from dozens of other authors.  A deluge of individual titles released on the same day will cause many of them to be overlooked by critics and others who drive comic demand.  Upon information and belief, this mass release was done because ALE was experiencing severe financial difficulties brought on by bad management and was in desperate need of cash.

305.    By releasing all five issues at the same time digitally (along with about 100 other titles), ALE was able to realize short-term revenues from the digital release but paid this Creator nothing.

306.    ALE badly compromised the value of the *Carmine* series by making the entire plot of the series available digitally, which had the effect of driving down demand.  This harmed value of *Carmine* as a literary and artistic work and harmed the Creator's reputation as a comic book author.

307.    Without making any effort to market the work ALE ultimately issued *Carmine* Issue No. 1 in print on October 14, 2020, Issue No. 2 on November 18, 2020 and Issue No. 3 on December 30, 2020. ALE, however, made no effort to promote or market *Carmine's* print release.

308.    Although the initial print issues did well, ALE inexplicably failed to release Issue No. 4 in print. When the Creator contacted ALE, its representatives did not inform her that ALE was, in fact, shut down. Instead, ALE falsely tried to blame Diamond, suggesting in February 2021 that Diamond had postponed the release.

309.    In March 2021, Ms. Douglas again contacted ALE seeking confirmation of the scheduled release of the print versions of Issues Nos. 4 and 5 and the TPB version of the work. ALE falsely informed Ms. Douglas that Issues Nos. 4 and 5 and the trade paperback version of *Carmine* were scheduled for release soon. on May 1, 2021, a representative of ALE again blamed Diamond, stating that ALE had scheduled the remaining issues and trade paperback for release with Diamond but was not sure what the delays were, other than Diamond allegedly holding onto the books.  These statements were false because ALE had no plans to release print versions of the remaining issues or the trade paperback version of the *Carmine* series.

310.    In January of 2021, international comic publisher Leviathan Labs in Italy had contacted ALE seeking rights to publish *Carmine* in Europe. ALE was at this time shut down and, contrary to its obligations to Ms. Douglas to make reasonable efforts to monetize *Carmine*, did not inform Ms. Douglas about this opportunity. ALE made no efforts to engage with Leviathan Labs and made no further effort whatsoever to sell the *Carmine* series in any market, costing the Creator a substantial source for revenues.

311.    ALE has failed to provide any revenues to this Creator at this time.

## XXIV.    JOHN MATSUYA/BEN MATSUYA – *MIDNIGHT MASSACRE*

312.    These Creators signed an agreement with ALE on 10/9/18. See Exhibit EE.

313.    The comic was distributed digitally after issues 1 to 3 were completed.  Creators never received quarterly earnings reports.

314.    Creators were told by ALE that there would be press, but Creators never saw anything other than a single link on the ALE home page.  Creators had to conduct their own marketing and hired a public relations agent.

315.    A trade paperback collection was listed on Amazon Marketplace for release on October 6, 2020.  Creators spent a great deal of time in September of 2020 promoting the book, whereas ALE did nothing on its end.

316.    The trade was subsequently delayed from October 6, to October 23, to May 11, 2021 with no communication from ALE.

317.    Creators were informed that the book was never printed, that it was not properly set up for the book market by Diamond, and that Seaton was working on publishing the project.

They were informed the intent was to publish by October of 2021. The book was never published.

318.    Creators never received any complimentary copies.


## XXV.  ROD ESPINOSA – *ADVENTURE FINDERS*

319.    This Creator signed an agreement with ALE on 1/11/2019.  See Exhibit FF.

320.    ALE did not communicate with Creator nearly all of 2020.

321.    ALE did not furnish sales reports nearly all of 2020.

322.    ALE did not send Creator all complimentary copies to which he was due.


## XVI. STEVE BRYANT – ATHENA VOLTAIRE

323.    This creator signed agreements with ALE on 2/16/16 and 12/12/16.  See Exhibit GG.

324.    ALE never signed the original agreement.

325.    Creator licensed the series to ALE but terminated the license, per the contract, in mid-2019 because, inter alia, Creator was never paid a page rate for this book (guaranteed by the licensing agreement) and received the licensing agreement royalty rate instead of the standard creator agreement. Terminating the licensing agreement reverted the contract to the original ALE creator agreement, which ALE never signed.

326.    Creator did not receive sales information for totals included for 2020 Q4, 2021 Q1, Q2, and Q3.

327.    No payments were made in over a year.

328.    Digital sales have never been reported or paid.

329.     Two other books, the Athena Voltaire Compendium (hardcovers originally published by Dark Horse, but bought by ALE, solicited, and sold), and Athena Voltaire Pulp Tales, were both released during the licensing period, but neither paid a page rate. Seaton contended that Athena Voltaire royalties were payable under different agreements, but none of the payments reflected this.

330.     ALE ran a Kickstarter campaign to launch the Athena Voltaire ongoing series but was late with fulfillment.  Defendant Seaton falsely blamed the delays on Creator.

331.     During the run of the Athena Voltaire ongoing series at ALE, there was a 6-month delay between issues 6 and 7.  Creator was falsely told that this delay was attributable to the printer.  This delay resulted in Diamond Comics Distribution canceling preorders on future issues of the series, effectively canceling the series.

332.     ALE horribly mismanaged and damaged the brand and the IP.


**XXVII. STEVE BRYANT/MARK STEGBAUER – GHOUL SCOUTS**

333.     These creators signed an agreement with ALE on 7/31/15.  See Exhibit HH.

334.     Creators did not receive sales information for totals included for 2020 Q4, 2021 Q1, Q2, and Q3.

335.     No payments were made in over a year.

336.     Digital sales have never been reported or paid.


**COUNT I**
**BREACH OF CONTRACT**
**PLAINTIFFS v. ALE**

337.     Plaintiffs reallege and incorporate by reference each of the foregoing allegations.

338.    The agreements entered into between ALE and the Plaintiffs/Creators hereinabove were adhesion contracts and therefore should be declared null and void.

339.    The agreements entered into between ALE and the Plaintiffs/Creators hereinabove were unconscionable and therefore should be declared null and void.

340.    ALE breached the agreements by not publishing all books in print as opposed to digitally.

341.    ALE breached the agreements by failing to make payments of royalties as required under the agreements.

342.    ALE breached the agreements by failing to produce quarterly reports as required under the agreements.

343.    ALE breached the agreements by overprinting copies, resulting in financial gain to ALE and financial losses to Creators.

344.    ALE breached the agreements by incurring delays in release dates or not at all releasing books.

345.    ALE breached the duty of good faith and fair dealing with respect to its agreements by failing to follow their own Handbooks, including but not limited to failing to offer promotional assistance in any reasonable capacity, failing to utilize free-to-use social media accounts, hindering Plaintiffs/Creator's promotional activities by not communicating clear release dates and giving advanced notices of dates that would not be met.

346.    ALE should be found to have breached all agreements with comics creators.

WHEREFORE, the Representative Plaintiffs and the Creators Class Plaintiffs pray for judgment against Defendant ALE for injunctive relief, monetary damages, attorneys costs and fees, and any additional damages the Court deems appropriate.

## COUNT II
## DECLARATORY JUDGMENT
## PLAINTIFFS v. ALE

347.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations.

348.    An actual, present and justiciable controversy has arisen and exists between the parties as to whether the Creators' Agreements have been terminated by ALE.

349.    The Creators contend that ALE effectively terminated the Creators' Agreements by failing to market the various properties, by failing to release properties in print, by failing to report sales and income figures, and by failing to pay revenues to Creators.

350.    Creators accordingly seek declaratory judgment from this Court that ALE breached its Agreements with the Creators and that ALE has no further right to print, sell, publish, distribute, advertise, publicize and exploit any of the properties named herein or otherwise entered into with members of the Creators Class not named herein.

351.    All agreements involving ALE and Creators should be declared null and void as a matter of equity.

WHEREFORE, the Representative Plaintiffs and the Creators Class Plaintiffs pray for judgment against Defendant ALE for injunctive relief, monetary damages, attorneys costs and fees, and any additional damages the Court deems appropriate.

## COUNT III
## FRAUD
## PLAINTIFFS v. BRYAN SEATON

352.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations.

353.    Defendant Seaton made promises to Plaintiffs/Creators that their works would be released in print, while knowing full well the projects would not be released in print.

354.    Defendant Seaton falsely claimed that release delays were the fault of Diamond or ALE's printers, when routinely ALE failed to even send books to printers, and failed to inform Diamond or retailers of important information.

355.    Defendant Seaton falsely told certain Plaintiffs/Creators that there were delays attributable to sizing problems caused by Creators, where these sizing problems were ALE's fault, not the Creators.

356.    Defendant Seaton told Plaintiffs/Creators that their books were sitting at Diamond's warehouses when this was not true; for example, certain Creators specifically checked with Diamond about their books.

357.    Defendant Seaton told creators that ALE bought ads in Previews Magazine when this was not true.

358.    Defendant Seaton responded to Plaintiffs'/Creators' emails by telling them that ALE's offices were closed, when in fact ALE did not have a central office and/or offices were not closed.

359.    Defendant Seaton told Plaintiffs/Creators that their books were sitting at Diamond warehouses, but when books did not come out on time, Diamond said this was not true, that books never even arrived from the printers.

360.    Defendant Seaton offered to return Plaintiffs'/Creators' property rights in return for paying exorbitant sums for copies of books that did not exist at the time, with the intent to get Creators to buy their rights back and to turn a profit on the Creators.  Creators were charged wholesale prices instead of being charged at cost as required by the agreements.

361.    Defendant Seaton irreparably hurt the reputations of Plaintiffs/Creators and their creative teams.

362.    Defendant Seaton failed to tell Plaintiffs/Creators about delays, which led to them spending money out of their own pockets.

363.    Defendant Seaton's fraudulent actions were intentional, reckless, grossly negligent, and deserving of an award of punitive damages.

WHEREFORE, the Representative Plaintiffs and the Creators Class Plaintiffs pray for judgment against Defendant ALE for injunctive relief, monetary damages, attorneys costs and fees, and any additional damages the Court deems appropriate.

Respectfully submitted,


**Lopez McHugh, LLP**


Michael S. Katz, Esquire
214 Flynn Avenue
Moorestown, NJ 08057
mkatz@lopezmchugh.com
Telephone: (856) 273-8500
Facsimile: (856) 273-8502
*Attorneys for Plaintiffs*


Dated: January 31, 2022